351 A.2d 650
COMMONWEALTH of Pennsylvania
v.
Harry Karl MARTIN, Appellant.

COMMONWEALTH of Pennsylvania
v.
James Evans KEYES, Appellant.

COMMONWEALTH of Pennsylvania
v.
Hector BURGOS, Appellant.

COMMONWEALTH of Pennsylvania
v.
Rafael NIEVES, Appellant.

COMMONWEALTH of Pennsylvania
v.
Warren CANOLES, Appellant.

COMMONWEALTH of Pennsylvania
v.
Dale TROOP, Appellant.

Supreme Court of Pennsylvania.
Argued Jan. 13, 1975.
Decided Jan. 29, 1976.

Theodore S. Danforth, Thomas E. Harting, William C. Haynes, Richard C. Shay, Lancaster, for appellants.

D. Richard Eckman, Dist. Atty., Louise G. Herr, Asst. Dist. Atty., Lancaster, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

These six appeals arise from appellants' convictions in the Court of Common Pleas of Lancaster County, for violations of the Uniform Controlled Substance, Drug, Device and Cosmetic Act,[1] all of which occurred during the months of April to June, 1972, Appellants raise no objections to their convictions. However, they contend that their sentences were imposed in accordance with a policy agreed to in advance by the three judges of the court and the district attorney's office without reference to either appellants' individual characteristics or to the circumstances of the particular offenses. An equally divided Superior Court affirmed the sentences in a per

---

1. Act of April 14, 1972, P.L. 233, § 1 et seq., 35 P.S. § 780–101 et seq. (Supp.1975). These convictions arise under id. § 13(a)(30), 35 P.S. § 780–113(a)(30).

curiam order.[2] Judge Spaeth, in his opinion in support of reversal joined by Hoffman and Cercone, JJ., stated:

"[T]he record demonstrates: That the three judges had agreed in advance that the sentence to be imposed for a sale of heroin should be three to ten years imprisonment plus a fine, without consideration being given to the defendant's individual characteristics, the sentence to be consecutive if more than one sale were proved; and that each of the six appellants was sentenced in accordance with this agreement. From these facts it follows that the sentences were illegal." [3]

We agree and vacate the sentences imposed and remand for resentencing.

## I.

Appellants were all charged with the illegal sale of controlled substances. There was no evidence of a conspiracy among the appellants, and no claim is made that the sentences imposed were based on such an allegation.

■ Appellant Harry Martin appeared before the Honorable Wilson Bucher on September 21, 1972, and pleaded guilty to three sales of heroin. The undercover agents involved gave a brief recitation of the circumstances of the sales, and an inquiry was made into the voluntariness of the guilty plea and of the waiver of trial by jury. Thereafter, defense counsel and appellant's mother were allowed to present evidence concerning appellant's background.[4] At 10:00 a. m. the court recessed

---

2. *Commonwealth v. Martin,* 226 Pa.Super. 181, 313 A.2d 264 (1973). We allowed this appeal under the authority of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1975).

3. *Commonwealth v. Martin,* 226 Pa.Superior Ct. 181, 190, 313 A. 2d 264, 269 (1973) (Spaeth, J., Opinion in Support of Reversal, joined by Hoffman and Cercone, JJ.).

4. Appellant had no prior record; had gone to the first semester of college but had dropped out for financial reasons; had held numerous employment positions; had served in the Armed Forces in Vietnam and received an honorable discharge; and had grown

until 2:00 p. m.[5] When court reconvened, Judge Bucher imposed a sentence of three to ten years imprisonment to be served consecutively, and a fine of $2,500 for each of the three sales, i. e., nine to thirty years and $7,500.[6]

Appellant Rafael Nieves was tried before the Honorable W. G. Johnstone, Jr., with a jury on September 25, 1972, and was found guilty of five counts of selling heroin. Appellant's attorney, at the outset of the trial, moved for a pretrial psychiatric examination because there was evidence that appellant was insane. He also moved for a change of venue asserting that the court had adopted an illegal sentencing policy. Both motions were denied without comment. At the sentencing hearing, only passing reference was made to appellant's background and mental capacity, and the question whether appellant was an addict, raised by defense counsel, was ignored.[7] A sentence of three to ten years' imprison-

up in a broken home. Appellant had used heroin before, but it was unclear whether he was addicted to the drug.

5. Appellants assert that during this recess the three judges and the district attorney's office conferred to determine the sentencing of all six appellants. Brief for appellants at 3. Appellee made no response to this contention, but there is nothing in the record to support it.

6. The court stated that it was applying the Drug, Device, and Cosmetic Act, Act of September 26, 1961, P.L. 1664, as amended, formerly codified as 35 P.S. § 780–20(d). The permissible range of sentence for the sale of heroin under that act was a fine not to exceed $5,000 and imprisonment of not less than five nor more than twenty years. In fact, the proper statutory provision, to the extent it does not set a greater penalty, was Act of April 14, 1972, P.L. 233, § 13(f)(1), 35 P.S. § 780–113(f)(1) (Supp.1975). See *Commonwealth v. Santiago*, 462 Pa. 216, 340 A.2d 440 (1975). The latter provision sets as a maximum sentence of $250,000 fine and fifteen years of imprisonment. We need not decide here whether this mistake alone would amount to an abuse of discretion by the sentencing court. However, it is obvious that the proper exercise of discretion requires that the court have an accurate understanding of the range of penalties allowed for by the Legislature.

7. The following exchange occurred during the abbreviated sentencing hearing:
"MR. SHAY [defense attorney]: This man was a user for five years. There seems to be a distinction between a pure

ment, to be served consecutively, and a fine of $100 for each count, was then imposed, i. e., fifteen to fifty years and $500.

Appellant Warren Canoles was tried before Judge Bucher, sitting with a jury; he was found guilty on September 28, 1972, of three counts of selling heroin. The jury added the words "with recommendation for treatment" to its verdict form. At the sentencing hearing, testimony was presented to the effect that appellant was addicted to heroin, that he had no prior offenses other than a minor drinking violation, and that he did not sell heroin for profit. These contentions were neither denied nor contradicted, and the court, before imposing sentence, made no further inquiry into any of these matters. During the hearing, the court made the following comments:

"He [appellant] was found guilty here of sales and we treated the others the same way.

. . . . . . . .

I shouldn't have to torture myself. The court has already determined it's three to ten years is that it's going to do. Why should I do any different in this case?

. . . . . . . .

The legislature says it's serious and they expect the courts to impose sentences to deter. I haven't heard any reason why we shouldn't give the standard sentence we have been giving this term of court.

. . . . . . . .

user and a seller. But the user who sells to support his own habit—
THE COURT: You have no concern about the victims.
MR. SHAY: Yes, sir. I think he should not receive an overburdensome sentence.
THE COURT: Okay, I will not give him an overburdensome sentence."
No further inquiry into appellant's addiction occurred.

The rehabilitation is a legislative and executive matter. I have nothing to do with rehabilitation.

. . . . . . . .

I don't think these sentences mean what they say, either.

I am going to sentence just as we have sentenced in the past."

These comments were made in response to attempts by defense counsel and an undercover agent to show that appellant Canoles sold only to users; that he was heavily addicted; that he was not a threat to the community; and that he was in need of treatment. These mitigating and extenuating circumstances were deemed irrelevant. The judge sentenced appellant "just as we have sentenced in the past": three to ten years imprisonment, to be served consecutively, and a fine of $100 for each count, i. e., nine to thirty years and $300.

Appellants Hector Burgos and James Keyes appeared separately before the Honorable W. Hensel Brown on September 29, 1972. Appellant Burgos pleaded guilty to two counts of selling heroin, and appellant Keyes pleaded guilty to three counts of selling heroin, two counts of selling cocaine and one count of selling marijuana.

The court made virtually no inquiry into either the circumstances of the crimes or appellants' backgrounds at either sentencing hearing.[8] Appellant Burgos received a

---

8. The following colloquy constitutes appellant Burgos' entire sentencing hearing:
   "THE COURT: Mr. Burgos, do you understand the English Language?
   MR. ROMEREZ (interpreter): No, he does not, sir.
   THE COURT: Has he been advised of the consequences of entering a guilty plea to the offense of selling a narcotic, heroin?
   MR. HAYNES [defense attorney]: Yes, he has, Your Honor.
   THE COURT: How much education has he had?
   MR. HAYNES: Eighth grade, sir.
   THE COURT: In Puerto Rico?
   MR. HAYNES: Yes, sir.
   THE COURT: Is he entering this plea of his own free will and without fear, threats or promises?

sentence of three to ten years imprisonment, to be served consecutively, and a fine of $1,500 for each count, i. e., $3,000 and six to twenty years. The sentence imposed on appellant Keyes was one to two years imprisonment, and a fine of $500 for the sale of marijuana; the same sentence for the two sales of cocaine; [9] and three to ten years imprisonment, and a fine of $2,500 for each of the three sales of heroin, the prison terms to be served consecutively, i. e., eleven to thirty-four years and $8,500.

Appellant Dale Troop was the last of the six appellants to be sentenced. He was found guilty of a single sale of heroin in a trial before Judge Brown, sitting with a jury. The sentencing hearing began immediately following the jury's verdict and consisted of statements filling a total of two and a half typewritten pages. The court made virtually no inquiry into the circumstances of the crime

> MR. HAYNES: Yes, sir.
> THE COURT: Does he understand that for a first offense of this nature, he could get a $5,000 fine and be sentenced to a minimum of five years to a maximum of twenty years? And, on a second offense, he could get a $15,000 fine and a minimum of ten years and a maximum of thirty years?
> MR. HAYNES: Yes, Your Honor. He is a first offender, sir.
> THE COURT: Not that the court is going to give that but that is what could be given.
> MR. HAYNES: Yes, sir, he understands that.
> Your Honor, these are members of his family here. He has had a lot of medical problems. He presently has a acute [sic] venereal disease and a stomach disorder. He has spent a lot of time in the hospital. He hasn't been able to work.
> THE COURT: How much did he sell here?
> TROOPER ECKENRUDE: On the first day, sir, he sold me four decks for $40.
> TROOPER GILLSON: On the Fifth of June, he sold four foil packets for $40." [Sentence imposed.]
> Because there was no trial, this colloquy is the sole basis upon which appellant was sentenced. It offers absolutely no basis for a determination of mitigating circumstances, appellant's background, or motivation for the sale.
> In appellant Keyes' hearing the prosecution maintained that appellant was not a user, but only a seller, of heroin. Appellant's counsel brought to the court's attention appellant's ill health, family and work status, all of which the court chose to ignore.

9. Apparently only one sentence was imposed for the two sales.

or appellant's background,[10] and imposed a sentence of three to ten years imprisonment and a fine of $2,500 for the single count.

The record amply demonstrates that the three judges had agreed in advance that the sentence to be imposed for a sale of heroin was to be three to ten years imprisonment plus a fine, and all of the sentences were to run consecutively.[11] In no case was a pre-sentence report or-

10. The following colloquy constitutes the entire sentencing record:

[Motion for new trial denied.]

"THE COURT: [W]hat has been the sentence imposed in other cases?

MR. LUCARELLI [district attorney]: Three to ten years. That was the Commonwealth's offer in this case.

THE COURT: I don't pénalize anybody for going to trial. This is a first offense?

MR. STAINTON [defense counsel]: Yes, your Honor, I believe it is.

MR. LUCARELLI: Your Honor, I might say, it is the Commonwealth's opinion that this man is not an addict and has been selling these drugs for profit only.

MR. STAINTON: I think Mr. Lucarelli is asking the Defendant be punished for going to trial.

THE COURT: Others were pushers too, Mr. Lucarelli, and they entered guilty pleas and even though the jury disbelieved him, and rightfully so, still he had a right—Constitutional right to go to trial.

Now, what is the fine that is imposed on these cases?

MR. LUCARELLI: There has been varying amounts. One person got a seventy-five hundred dollar fine on three counts—

THE COURT: All right. Anything you want to say?

MR. STAINTON: No, Your Honor." [Sentence imposed.]

11. The Commonwealth argues that different sentences were imposed because of the differences in the amount of the fines. This contention is without merit. It appears that the fines were based solely on whether the particular defendant had any assets. Thus they reflect neither the backgrounds of the appellants nor the circumstances of the crime. Furthermore, the terms of imprisonment are the real and effective sentences, and, in these cases the prison terms are identical.

Mr. Justice Nix, in dissent, asserts that no such plan existed, relying on five cases which were not appealed. These cases do not alter our conclusion. Two unappealed cases, *Commonwealth v. Brown* and *Commonwealth v. Ortego,* according to appellee's appendix to its brief, were sentenced in accordance with the court's predetermined "standard sentence." They therefore fully support appellants' allegations. The sentencing hearing in *Com-*

dered. No meaningful inquiry was made into the appellants' backgrounds, individual characteristics, relative culpability or prospects for rehabilitation, despite clear evidence that the appellants' offenses were committed in varying circumstances. In short, all appellants' sentences

monwealth v. Cordova occurred a year and a half after all appellants had been sentenced. Commonwealth v. Gonzales is also distinguishable because, according to appellee's appendix to its brief, the defendant was sentenced on two counts, but only one of these was for the sale of heroin—the subject of the sentencing plan. Thus, only Commonwealth v. Amaro might challenge this conclusion, and the record does not establish on what basis the "non-standard" sentence was imposed.

Even assuming these cases do not confirm the existence of a sentencing plan, they do not alter the fact that these six appellants were sentenced according to such a plan. There is no basis for the dissenting opinion's conclusion that "the record conclu- sively establishes sales of heroin for profit absent any significant mitigating or extenuating circumstances" or for its assertion that the crimes were inspired by "greed." First, there was evidence before the sentencing courts that these defendants committed the crimes in strikingly different circumstances. For example, appellant Canoles, according to the uncontradicted testimony of both the Commonwealth's undercover agent and appellant's counsel was heavily addicted and did not sell for profit, yet he received a stiffer sentence than appellant Burgos, who was alleged to be un- addicted and a pusher. These differences were treated as irrele- vant and were ignored. (See supra at 653–654.) Second, the sen- tencing hearings were too cursory to establish that no mitigating or extenuating circumstances existed (see, e. g., supra at 653–654, note 8; supra at 654, note 10). No pre-sentence reports were re- quested by the sentencing courts to correct this deficiency. The dissenting opinion's reliance on the colloquy in appellant Martin's sentencing hearing is misplaced. That colloquy occurred prior to imposition of any of these sentences and prior to the time that, appellants contend, the sentence procedure was determined (see supra at 651–652). As the remaining sentencing colloquies dem- onstrate, these sentences were imposed without reference to any mitigating or extenuating circumstances. Third, to deny the exis- tence of a "standard sentence" without regard to individualized circumstances in these six cases ignores the very words used by at least one of the sentencing judges (see supra at 652–653).

Finally, the dissenting opinion's characterization of these sen- tences as "uniform" is inaccurate. The arbitrary decision to make the sentences consecutive, without regard to the circum- stances of the individual defendant, resulted in widely differing sentences. Such arbitrary determinations, made prior to the sen- tencing hearings which are intended to provide information for making the determinations, have no place in an individualized sentencing scheme (see infra at 657, n. 23).

were based on an abstract predetermination of the sentence to be imposed for the particular offense, without regard to the individual circumstances of particular cases.

## II.

Mr. Justice Schaefer of the Supreme Court of Illinois has stated:

"The quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal laws." [12]

Sentencing procedures, which have undergone substantial revision during the last one hundred years, have become a reflection of the effectiveness of that enforcement. At one time, sentencing by a court after a finding of guilt was purely ceremonial, since there was but one penalty at law for any given crime.[13] However, during the nineteenth century, when incarceration became the primary mode of punishment, the practice of discretionary sentencing began.[14] At first this took the form of executive pardons, and the judge's duty remained only to apply the sentence mandated by law.[15] However, discretionary sentencing soon became an integral part of judicial procedure; the sentencing court had increasing discretion in its choice of sentence.[16] This development re-

12. Schaefer, Federalism and State Criminal Procedure, 70 Harv.L. Rev. 1, 26 (1956).

13. See generally *Williams v. New York*, 337 U.S. 241, 247–48, 69 S.Ct. 1079, 1083–84, 93 L.Ed. 1337; Dershowitz, Indeterminate Confinement: Letting the Therapy Fit the Harm, 123 U.Pa.L.Rev. 297, 304–15 (1974); Note, Procedural Due Process at Judicial Sentencing For Felony, 81 Harv.L.Rev. 821, 821–25 (1968).

14. Id. The first indeterminate sentence law was passed in New York in 1877. Ch. 173 [1877] Laws of New York.

15. For a discussion of the "grace" conception of sentencing, see Kadish, Legal Norm and Discretion in the Police and Sentencing Processes, 75 Harv.L.Rev. 904, 919–25 (1962). See also Note, supra note 13, at 822.

16. At least one commentator has noted that the maximum penalties under indeterminate sentencing are usually longer than the fixed penalties used for the same crime prior to this reform. Dershowitz, supra note 13, at 303.

flected the move toward individualized sentencing, which attempted to rehabilitate, as well as to punish, the offender.[17]

The indeterminate sentence won early recognition in Pennsylvania. The Act of June 19, 1911, P.L. 1055 § 6, as amended, 19 P.S. § 1057 (1964), provides in pertinent part:

"Whenever any person, convicted in any court of this Commonwealth of any crime punishable by imprisonment in a State penitentiary, shall be sentenced to imprisonment therefor in any penitentiary or other institution of this State, or in any county or municipal institution, the court, instead of pronouncing upon such convict a definite or fixed term of imprisonment, shall pronounce upon such a convict a sentence of imprisonment for an indefinite term: Stating in such sentence the minimum and maximum limits thereof; and the maximum limit shall never exceed the maximum time now or hereafter prescribed as a penalty for such offense; and the minimum shall never exceed one-half of the maximum sentence prescribed by any court."

The Legislature reinforced these provisions by allowing suspension of sentence and probation, at the sentencing court's discretion, in all but the most serious crimes. Act of June 9, 1911, P.L. 1055, § 1, as amended, 19 P.S. § 1051 (1964). The court has the power to use this sentencing alternative where:

". . . the said court believes that the character of the defendant and the circumstances of the case [are] such that he or she is not likely again to engage in an offensive course of conduct, and that the public good does not demand or require that the defendant should suffer the penalty imposed by law . . .."

Id. Moreover, if more than one sentence is being imposed on the defendant at one time, the sentencing court

17. *Williams v. New York*, supra note 13, at 248, 69 S.Ct. at 1084; Note, supra note 13, at 823–25.

has the power to have them run concurrently or consecutively.[18] The Legislature gave the trial court the power to order a pre-sentence report and a psychiatric and diagnostic examination of the defendant in order to properly determine the appropriate disposition.[19]

Pennsylvania's procedure of indeterminate sentencing carries with it an implicit adoption of the philosophy of individual sentencing.[20] This necessitates the granting of broad discretion to the trial judge, who must determine, among the sentencing alternatives and the range of permissible penalties, the proper sentence to be imposed.[21]

18. Act of May 28, 1937, P.L. 1036, § 1 (formerly codified as 19 P. S. § 894) (suspended effective October 21, 1973, by Pa.R.Crim.P. 1415). See Pa.R.Crim.P. 1406(a); 18 Pa.C.S. § 1321(a) (Supp. 1975).

19. Act of March 31, 1860, P.L. 427, § 73.1, as amended (formerly codified as 19 P.S. § 890) (suspended effective October 21, 1973, by Pa.R.Crim.P. 1415). See Pa.R.Crim.P. 1403.

20. The Legislature has recently codified this philosophy that has long been implicit in our law:
". . . the court shall follow the general principle that the sentence imposed shall call for the minimum amount of confinement that is consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant."
18 Pa.C.S. § 1321(b) (Supp.1975).
This section is part of the Sentencing Code, enacted on December 30, 1974, effective March 30, 1975. Consequently, it is not, as such, applicable to these sentences, imposed in 1972.
The principle articulated in section 1321(b) is substantially the same as the general principle enunciated by the ABA Project on Minimum Standards of Justice. See ABA Project on Minimum Standards of Justice, Standards Relating to Sentencing Alternatives and Procedures § 2.2 (Approved Draft, 1968). The commentary to that section makes clear that it is based on the committee's strong view that dislocation of the offender from the community should be minimized.

21. There have been numerous attacks on indeterminate sentences on the ground that they are inherently unfair. Many authorities now advocate a return to sentencing for specific terms in at least some situations. See, e. g., Struggle for Justice: A Report on Crime and Punishment in America Prepared For the American Friends Service Committee, 147–48 (1971); Frankel, Lawlessness in Sentencing, 41 U.Cin.L.Rev. 1 (1972). Such a change, however, if deemed desirable, must come from the Legislature.

The importance of this discretion cannot be overemphasized; many commentators argue that it is one of the most important, and most easily abused, powers vested in the trial court today.[22] In *United States v. Waters*, 141 U.S.App.D.C. 289, 437 F.2d 722, 723 (1970), Judge Wilkey, speaking for the court, states:

"What happens to an offender after conviction is the least understood, the most fraught with irrational discrepancies, and the most in need of improvement of any phase in our criminal justice system."

The Commonwealth argues that this sentencing discretion should not be disturbed unless the trial court exceeds the statutorily prescribed limits or is so manifestly excessive as to constitute too severe a punishment. See *Commonwealth v. Williams*, 456 Pa. 550, 551–52, 317 A. 2d 250, 251 (1974); *Commonwealth v. Lee*, 450 Pa. 152, 156, 299 A.2d 640, 642 (1973); *Commonwealth v. Person*, 450 Pa. 1, 4–5, 297 A.2d 460, 462 (1972); *Commonwealth v. Wrona*, 442 Pa. 201, 206, 275 A.2d 78, 81 (1971).

It is true that the sentence imposed is normally left undisturbed on appeal because the trial court is in a far better position to weigh the factors involved in such a determination. However, we have held that the court's discretion must be exercised within certain procedural limits, including the consideration of sufficient and accu-

22. Indeed, many cite it as a primary source of unfairness within the indeterminate sentencing procedure. Professor Kadish states: ". . . the new penology has resulted in vesting in judges and parole and probation agencies the greatest degree of uncontrolled power over the liberty of human beings that one can find in the legal system." Kadish, supra note 15, at 916.

Professor Davis discusses the wide disparity in sentencing practices caused by this uncontrolled discretion. He urges procedural structuring which would change "unguided discretion to guided discretion." K. Davis, Discretionary Justice 133–141, 135 (1969). See also Palmer, A Model of Criminal Dispositions, 62 Geo.L.J. 1–59 (1973); ABA Commission on Standards of Judicial Administration, Standards Relating to Trial Courts, § 2.00(c) (Tentative Draft, 1975).

rate information. In *Commonwealth v. Green*, 396 Pa. 137, 151 A.2d 241 (1951), a first degree murder case, we held that the trial court abused its discretion when it imposed the death penalty solely on the basis of the criminal act. There was no consideration of the character of the convicted individual and no inquiry was made into any extenuating or mitigating circumstances. See also *Commonwealth v. Irelan*, 341 Pa. 43, 17 A.2d 897 (1941); *Commonwealth v. Garramone*, 307 Pa. 507, 161 A. 733 (1932). In *Commonwealth v. Phelps*, 450 Pa. 597, 301 A.2d 678 (1973), we held that, if the court orders a presentence report, defense counsel has a right to examine its contents before sentencing and, if he contests any portion, to offer evidence in rebuttal. We note further that such review is in conformity with the ABA Project on Minimum Standards of Justice, Standards Relating to Appellate Review of Sentencing, § 3.2 (Approved Draft, 1968):

> "The authority of the reviewing court with respect to the sentence should specifically extend to review of:
>
> .    .    .    .    .    .    .    .
>
> (ii) the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based."

The procedures employed by the sentencing court in the appeals before us today ignore the basic premises of Pennsylvania individualized sentencing. Here, as in *Green*, the nature of the criminal act was used as the sole basis for the determination of the length of sentence, and all sentences of imprisonment were to run consecutively.[23]

---

**23.** We note that the same factors relevant to other determinations of sentencing are applicable to the decision to have terms of imprisonment run consecutively rather than concurrently. See generally ABA Project on Minimum Standards of Justice, Standards Relating to Sentencing Alternatives and Procedures, § 3.4 (Approved Draft, 1968).

Thus the court failed to exercise its broad discretion in accordance with the applicable statutory requirements.[24]

■■ The sentence must be imposed for the minimum amount of confinement that is consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. See 18 Pa.C.S. § 1321(b) (Supp.1975).[25] At least two factors are crucial to such determination—the particular circumstances of the offense and the character of the defendant. Pa. R.Crim.P. 1403(a)(2) provides that all pre-sentence reports shall include such information. We hold that regardless of whether a pre-sentence report is ordered, the sentencing court must at least consider these two factors in its sentencing determination. Failure to give such individualized consideration requires that these sentences be vacated.

Obviously, the extent and the contents of a pre-sentence inquiry will vary depending on the particular case. A more extensive and careful investigation is clearly called for in felony convictions, particularly where long terms of confinement are contemplated. The ABA Project on Minimum Standards of Justice has stated the essential and adequate elements of a full pre-sentence

---

**24.** Contrary to the dissenting opinion's assertion, we too believe that the seriousness of defendant's crime may itself necessitate imposing total confinement rather than probation. The applicable statute, 18 Pa.C.S. § 1325 (Supp.1975), states:

"The court shall impose a sentence of total confinement if, having regard to the nature and circumstances of the crime and the history, character, and condition of the defendant, it is of the opinion that the total confinement of the defendant is necessary because:

.  .  .  .  .  .  .  .  .  .

(3) a lesser sentence will depreciate the seriousness of the crime of the defendant."

However, we cannot agree with the dissent's apparent assertion that the nature of defendant's crime can dictate not only total confinement but also a fixed term of confinement without regard to individual circumstances.

**25.** See note 20 supra.

report.[26]  We note that most of these factors are clearly relevant in any sentencing disposition, although the weight given by the sentencing court to any one factor must depend on the particular case.

In these cases the court did not order any pre-sentence reports although it was authorized to do so. See Pa. R.Crim.P. 1403.  Normally such reports should be used, although they are sometimes unnecessary because other sources of information are available.  However, pre-sentence reports are of obvious importance to the sentencing court.  In *Williams v. New York*, 337 U.S. 241, 249–50,

26. "(A) a complete description of the offense and the circumstances surrounding it, not limited to aspects developed for the record as part of the determination of guilt;

(B) a full description of any prior criminal record of the offender;

(C) a description of the educational background of the offender;

(D) a description of the employment background of the offender, including any military record and including his present employment status and capabilities;

(E) the social history of the offender, including family relationships, marital status, interests and activities, residence history, and religious affiliations;

(F) the offender's medical history and, if desirable, a psychological or psychiatric report;

(G) information about environments to which the offender might return or to which he could be sent should probation be granted;

(H) supplementary reports from clinics, institutions and other social agencies with which the offender has been involved;

(I) information about special resources which might be available to assist the offender, such as treatment centers, residential facilities, vocational training services, special educational facilities, rehabilitative programs of various institutions to which the offender might be committed, special programs in the probation department, and other similar programs which are particularly relevant to the offender's situation;

(J) a summary of the most significant aspects of the report, including specific recommendations as to the sentence if the sentencing court has so requested."
ABA Project on Minimum Standards of Justice, Standards Relating to Probation, § 2.3 (Approved Draft, 1970).  See also, Advisory Council of Judges of the National Probation and Parole Association, Guides for Sentencing, 33–47 (1957).

69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1965), the United States Supreme Court stated:

"[Pre-sentence] reports have been given a high value by conscientious judges who want to sentence persons in the best available information rather than on guess-work and inadequate information. To deprive sentencing judges of this kind of information would undermine modern penological procedural policies . . .."

The ABA Project on Minimum Standards of Justice, Standards Relating to Probation § 2.1 (Approved Draft, 1970), recommends that a pre-sentence report is peculiarly necessary in any of the following circumstances: 1) where incarceration for one year or more is a possible disposition; 2) where the defendant is less than twenty-one years old; and 3) where the defendant is a first offender.[27] These situations require the utmost care in sentence determination. We are therefore requesting that the Criminal Procedural Rules Committee prepare a recommendation for the Court amending Rule 1403 to require that, whenever a sentencing court fails to order a pre-sentence report in any of these situations, it shall place in the record its reasons for dispensing with such report.

---

**27.** Two federal circuits have adopted a similar policy. In *United States v. Frazier,* 479 F.2d 983 (2d Cir. 1973), the court held that a sentencing court abused its discretion by neither ordering a pre-sentence report nor justifying its action in the record. Accord, *United States v. Manuella,* 478 F.2d 440 (2d Cir. 1973). In *United States v. Dinapoli,* 519 F.2d 104 (6th Cir. 1975), the court held that, prior to sentencing a youthful offender to a substantial term of imprisonment, the sentencing court must order a pre-sentence report and conduct a sentencing hearing.

Many respected commentators would make pre-sentence reports mandatory in situations similar to those proposed here. See, e. g., American Law Institute, Model Penal Code Sentencing Provisions § 7.07(1) (Proposed Official Draft, 1962); Davis, supra note 21, at 138; National Advisory Commission on Criminal Justice, Standards and Goals, Corrections § 16.10 (1973).

Order of the Superior Court affirming judgments of sentence reversed. Judgments of sentence vacated and cases remanded for resentencing.

EAGEN, J., concurs in the result.

NIX, J., filed a dissenting opinion in which JONES, C. J., joins.

NIX, Justice (dissenting).

The sentencing decision is the most complex and difficult function a jurist is called upon to perform.[1] Because of the nature of the decision and the variables upon which it depends,[2] we have long recognized the wisdom in vesting this responsibility within the discretion of the trial judge and we have been loath to interfere except where there has been a clearly demonstrated abuse of that discretion.[3]

Recognizing the trial judge's unique position to perform this function[4] we have deliberately curtailed the scope of appellate review in this area.

1. The sentencing decision encompasses a number of judgments. A determination must be made as to whether imprisonment or some other alternative is appropriate. If imprisonment is to be imposed, the length of the confinement must be established. This judgment in turn requires a decision as to when parole eligibility should attach and also the maximum period that society must exercise control over the offender to minimize the possibility of future antisocial behavior. Further, where the options exist, the trial judge must select the institution best structured for the supportive help required by the particular offender.

2. A balance must be struck among many factors that should influence the sentencing decision. The need for deterrence, incapacitation, retribution, a recognition of mitigating circumstances and aggravating circumstances, and the possibility for rehabilitation are but a few of the considerations that must enter this decision.

3. See, for example, *Commonwealth v. Green*, 396 Pa. 137, 151 A. 2d 241 (1959); *Commonwealth v. Irelan*, 341 Pa. 43, 17 A.2d 897 (1941); *Commonwealth v. Garramone*, 307 Pa. 507, 161 A. 733 (1932).

4. "The consideration of the criminal himself is peculiarly within the sentencing judge's domain. Only he can judge attitude and

"The Court has said many times that the Commonwealth has no right to appeal from an adverse ruling in the trial court unless a pure question of law is involved, and that the Commonwealth may not appeal if the action complained of is based on an admixture of law and fact. See *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963); *Commonwealth v. Melton,* 402 Pa. 628, 168 A.2d 328 (1961); and *Commonwealth v. Hartman,* 383 Pa. 461, 119 A.2d 211 (1956).

Whether a trial judge imposed a proper sentence on a criminal defendant does not present a pure question of law, unless the sentence exceeds the statutorily prescribed limits or is such as to be constitutionally impermissible. In the usual case, the problem presents a mixture of law and fact. Hence, our Superior Court has correctly ruled that the sentence imposed on a person convicted of crime lies with one exception (where the conviction is for first degree murder following a trial by jury) within the sole discretion of the trial court, and the sentence imposed will not be reviewed by an appellate court, unless it exceeds the statutorily prescribed limits or is so manifestly excessive as to constitute too severe a punishment. See *Commonwealth v. Bilinski,* 190 Pa.Superior Ct. 401, 154 A.2d 322 (1959)."

*Commonwealth v. Wrona,* 442 Pa. 201, 206, 275 A.2d 78, 80–81 (1971).

See also *Commonwealth v. Lee,* 450 Pa. 152, 156, 299 A. 2d 640, 642 (1973).

In the instant appeals, it is conceded that the statutorily prescribed limits have not been exceeded nor were the

demeanor of the defendant. Only he can judge defendant's repentance or lack of it. Only he can appraise defendant's awareness of the seriousness of his offense and his understanding of the affront to society. . . . No record, for example, could perpetrate a scowl of resentment or blind indifference."
*United States ex rel. Huntt v. Russell,* D.C., 285 F.Supp. 765, aff'd 406 F.2d 774 (3 Cir. 1968).

sentences manifestly excessive as to constitute an unduly severe punishment. In my judgment the majority opinion introduces a concept of appellate review that would permit an appellate tribunal to superimpose its sentencing philosophy upon the sentencing court. I believe this intrusion upon the trial court's sentencing discretion is unwarranted and therefore register my dissent.

The majority attempts to establish the legitimacy of its position and to deny its deviation from our former position by asserting "the record amply demonstrates that the three judges had agreed in advance" upon the sentence and failed to make a meaningful inquiry into "appellants' backgrounds, individual characteristics, relative culpability or prospects for rehabilitation." I do not believe that the record established that the trial judges ignored those factors upon which the sentencing decision should be premised. Further, in my judgment, the majority's real complaint is the weight to be attached to the germane variables in the sentencing decision.

This jurisdiction is committed to the principle of individualized sentences. However, as conceded by the majority, the most frequent and justifiable criticism of this policy is the unsupportable disparity which all too frequently results.[5] Thus, judges should not be discouraged

5. See generally, ABA Standards Relating to Appellate Review of Sentences § 1.2 (Approved Draft April 1967); Frankel, *Criminal Sentences—Law Without Order*, 88 (1972); Glueck, Crime and Justice 115–129 (1936); Institute of Judicial Administration, *Disparity in Sentencing of Convicted Defendants* (1954); Mitford, *Kind and Unusual Punishment* (1973); Hearings before Subcommittee No. 3 of the House Committee on the Judiciary, 85th Cong., 2d Sess., ser. 14, at 41–67 (1958) (Testimony of Mr. Bennett); *Struggle for Justice: A Report on Crime and Punishment in America*, Prepared for the American Friends Service Committee (1971); Dershovitz, *Indeterminate Confinement; Letting the Therapy Fit the Harm*, 123 U.Pa.L.Rev. 297 (1974); The Honorable Edward J. Devitt, How Can We Effectively Minimize Unjustified Disparity in Federal Criminal Sentences? 41 F.R.D. 249 (1967); Honorable Marvin E. Frankel, *Lawlessness in Sentencing*, 41 U.Cin.L.Rev. 1 (1972); Kadish, *Legal Norm and Discretion in the Police and Sentencing Processes*, 75 Harv.L.Rev. 904 (1962); Palmer, *A Model of Criminal Disposition*, 62 Geo.L.J. 1 (1973);

from achieving uniformity in sentences where there are no significant differences in the nature of the crime and the background of the offender to dictate a contrary result.

In appraising appellants' contention, which was accepted by the majority, that the Judges of Lancaster County had agreed upon a formula for sentencing which ignored the peculiarities of the particular cases, we must turn to the factual setting in which these appeals arose. The Pennsylvania State Police, as a result of a special investigation, gathered evidence as to drug sales in the Lancaster County area which culminated in a large raid on July 19, 1972.[6] Twenty-three persons were arrested and charged with drug sales. Eleven of these individuals were charged with sales of heroin. The majority supports its conclusion that the judges of the county reached a consensus as to the treatment of those convicted of sales of heroin [7] from an analysis of only six of these eleven cases.[8]

Rubin, Disparity and Equality of Sentences, 40 F.R.D. 55 (1966); *Collective Sentencing Decision in Judicial and Administrative Contests*, 11 Am.Crim.L.Rev. 695 (1973).

6. The fact that state law enforcement officials, as opposed to local enforcement agents, conducted this investigation, is indicative of at least the suspected high incidence of drug traffic within this county at that particular time. These suspicions were obviously confirmed by the number of arrests that resulted.

7. The majority concludes that there was an agreement among the members of the court to impose a sentence of three to ten years imprisonment plus a fine for a sale of heroin and that the sentences were to run consecutively for each count.

8. Appellants set forth in their brief the disposition of the other five cases, four of which would seriously question the legitimacy of the conclusion that the judges had, in fact, agreed upon a formula. *Commonwealth v. Ortego*—two counts of selling heroin resulted in a sentence of three to ten years on one count and two years probation to run concurrently on the second. *Commonwealth v. Amcro*—two counts of selling heroin—two to five years on one count and a concurrent sentence of two to five years on the second count. *Commonwealth v. Gonzales*—four counts of selling heroin—four to fifteen years of imprisonment. *Commonwealth v. Cordova*—25 counts of selling heroin—one to two years imprisonment.

If we accept the validity of using these six cases as evidence of a consensus, it nevertheless overstates the case to argue that the resultant formula eliminated the sentencing judges' exercise of discretion in the individual cases. As noted earlier (see footnote 1), the sentencing decision encompasses a number of judgments. At best, the record would arguably support that this consensus affected only one of these judgments, to wit, the length of the prison term to be imposed.

The first and most important judgment is the determination as to whether imprisonment or some other viable alternative is appropriate. The majority unjustifiably assumes that because in these six cases, imprisonment was chosen as the appropriate punishment, that this fact necessarily suggests that the alleged agreement dictated the decision. I strenuously disagree because I know of no responsible jurist at this particular time in America who would not recognize the necessity of imprisonment where the record conclusively establishes sales of heroin for profit absent any significant mitigating or extenuating circumstance. In my judgment, the reason that prison sentences were imposed in the six cases was completely unrelated to any consensus, but rather because this judgment was dictated by the nature of the crime and a consideration of all of the surrounding circumstances including the background of the individual appellants.

My reading of the record satisfies me that this alleged agreement as to the term of imprisonment was not of such an iron-clad nature that it would exclude consideration of significant legitimate factors. The judges permitted the defense to fully develop all mitigating and extenuating information and considered this evidence in reaching its decision.[9] The record also establishes that

9. My reading of the record forces me to conclude that the majority's charge that the judges "made virtually no inquiry into the circumstances of the crime or appellants' background" is completely without foundation. Not only were the appellants given

the judges distinguished between the sale of heroin and the sale of less dangerous drugs. The fact that the alleged agreed upon sentence was imposed in the six instances was, in my judgment, indicative of the fact that there was no basis for any significant differences in treatment between the offenders. In each instance, the record supports a finding that the offenders were engaged in the traffic of heroin for profit.

Where the nature of the criminal conduct is substantially the same and the background of the offenders are comparable, uniformity of treatment is to be desired. If, in fact, the judges of this county reached a consensus that provided uniformity in treatment and yet allowed for significant individual differences, I believe such a procedure would be in accord with the modern view of sentencing.[10]  One of the reasons for vesting in trial

full opportunity to supply the sentencing judge with any information they might have deemed relevant to the question of the penalty to be imposed, in a number of instances the judges on their own initiative sought to ascertain whether appellants' conduct was inspired by greed or as a result of addiction.

The following extract from the record in *Commonwealth v. Martin,* is illustrative:

"THE COURT: Mr. Shay, do I understand that he sold this for money, that is to say, that he didn't use this to support his habit, this was a cynical, deliberate sale of heroin?

MR. SHAY: That's in dispute to some extent.  He did sell it for money to some degree, but he claims he also used it on some occasions.

THE COURT: He is not a drug addict?

MR. SHAY: I don't know if he can make that claim or not.

MR. LUCARELLI: Your Honor, if I might speak to that point, Trooper Gills and Trooper Rogers, who were out on the streets at this time and say from the Defendant and from the people around him tell me that the Defendant isn't an addict but he was in the business of selling heroin for profit.

He had a 1972 car, a 1972 Thunderbird and he had a job. There was attempts on the sale in the street for this Defendant and two other men to form a syndicate to control the heroin traffic in Lancaster and force the Puerto Ricans out of the business.  This is not a case that we have some poor addict selling to support his habit, he's trying to corrupt all of the rest of the people in the county."

10.  Legal text writers have repeatedly approved of the multi-judge sentencing panels in the Eastern District of New York, the East-

judges wide discretion in this area is to permit them to use their initiative in attempting to enhance the quality of sentencing. Nor do I perceive any reason why judicial initiative must await legislative fiat. Where the alleged agreed upon term of imprisonment was substantially below the maximum prescribed for the criminal conduct, there would be no occasion to alter this sentence for minor differences in the background of the individual offenders. The only significant difference reflected in this record was the number of counts for which the various appellants were convicted. The sentences imposed reflected this difference.

I also reject appellants' argument that pre-sentence reports should have been obtained in these instances. None of these appellants specifically requested that a pre-sentence report be made. More importantly, there was nothing in the record of any of these cases which would suggest additional information, not already possessed by the court, would have been obtained if such a procedure had been followed. Our Pennsylvania Rule of Criminal Procedure 1403 places the decision as to whether a presentence investigation report should be prepared, within the discretion of the trial judge. Where, as here, there was ample evidence to determine that these crimes were inspired by greed and the defense had been given full opportunity to articulate any extenuating or mitigating circumstances, I do not believe that a decision that a pre-sentence report was unnecessary was an abuse of that discretion.

I would affirm the judgment of sentence in each case.

JONES, C. J., joins in this dissenting opinion.

ern District of Michigan, the New York Supreme Court, Bronx County, and the Superior Court of the District of Columbia. See, for example, *Collective Sentencing Decision in Judicial and Administrative Contests, supra* at n. 5 and *Lawlessness in Sentencing, supra* at n. 5. The formation of such panels for the discussion among judges of the appropriate sentence to be imposed for a particular crime when the defendant's individual characteristics place him within a limited category, does not violate any ideal of individualized sentencing.